85 P.3d 634

**STATE of Hawai'i, Respondent/Plaintiff–Appellant**

**v.**

**Reynaldo CUNTAPAY, Petitioner/Defendant–Appellee.**

**No. 24841.**

Supreme Court of Hawai'i.

March 5, 2004.

Catherine H. Remigio, Deputy Public Defender, on the application for petitioner/defendant-appellee.

LEVINSON, ACOBA, and DUFFY, JJ.; and NAKAYAMA, J., dissenting, with whom MOON, C.J., joins.

Opinion of the Court by ACOBA, J.

We granted certiorari herein and hold that under Article I, section 7 of the Hawai'i Constitution,[1] a guest of a homedweller is entitled to a right of privacy while in his or her host's home. Under the circumstances of this case, Petitioner/Defendant–Appellee Reynaldo Cuntapay (Petitioner) had such a right. Insofar as a majority of the Intermediate Court of Appeals (the ICA) held on appeal that Petitioner had not demonstrated he had an expectation of such privacy and that such expectation was reasonable, it was

incorrect. Thus, we reverse the Summary Disposition Order (SDO) of the ICA[2] filed on September 15, 2003, vacating the order of the second circuit court (the court)[3] granting Petitioner's motion to suppress evidence recovered from his host's home. We affirm the court's order but on independent state constitutional grounds discussed herein, rather than on Fourth Amendment grounds cited by the court.

I.

Petitioner was charged in a June 15, 2001 complaint with promoting a dangerous drug in the third degree, Hawai'i Revised Statutes (HRS) § 712–1243(1) (1993)[4] (Count I) and unlawful use of drug paraphernalia, HRS § 329–43.5(a) (1993) (Count II). On July 24, 2001, Petitioner filed his motion to suppress evidence and statements. On August 23, 2001 and October 4, 2001, hearings were held on the motion.

On December 19, 2001, the court issued its findings of fact (findings) and conclusions of law (conclusions) granting Petitioner's motion to suppress. Respondent/Plaintiff–Appellant State of Hawai'i (the prosecution) does not take issue with the court's findings. The court made the following pertinent findings:

1. On June 5, 2001, at approximately 10:58 a.m., Officers Randy Esperanza and Lance Marks of the Maui County Police Department made a check of 835 Kuialua Street, Lahaina, Maui, Hawai'i for an individual with an outstanding bench warrant. Although the address on the bench warrant was different, the officers went to 835 Kuialua Street because the person named in the bench warrant had previously used 835 Kuialua Street as a residence address.

2. As the officers approached the garage area of the residence, they observed

---

1. Article I, section 7 states as follows:

 The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

2. Chief Judge James S. Burns and Associate Judge Corinne K.A. Watanabe issued the majority Summary Disposition Order and Associate Judge John S.W. Lim issued a dissent.

3. The Honorable Joseph E. Cardoza presided over this matter.

4. Only HRS § 712–1243(3) was amended in 1996 and 2002.

approximately seven to ten adult males in the garage. Some of the males were standing and others were seated around a table in the garage.

3. *The officers approached the males in the garage* and observed money and playing cards on the table. The officers did not hear any bets made, see any money exchanged, nor observe anyone act as the house for possible gambling activity. *The officers could not tell what game was being played nor were they sure there was any illegal gambling taking place.*

4. As the officers approached, the males appeared scared, began to grab money from the table and scrambled away from the table.

5. *Defendant, who had been in the garage as the police approached, was not the person named in the bench warrant the police were attempting to serve.* No one else at the scene proved to be the person named in the bench warrant.

6. *As Officer Esperanza approached, Defendant walked away from him. Defendant walked to a washroom located in the garage area.* The door to the washroom was open.

7. As Defendant walked away from Officer Esperanza, he had a small black object in his right hand.

8. Officer Esperanza observed Defendant walk into the washroom and reach behind a washing machine. *After doing so, Defendant immediately walked out of the washroom and to Officer Esperanza.* As Defendant did so, Officer Esperanza no longer saw anything in Defendant's hands.

9. After Defendant left the washroom, Officer Esperanza asked Officer Marks to assist him by watching Defendant. *Officer Esperanza then entered the washroom and looked behind the washing machine. While doing so, Officer Esperanza observed a small magnetic box, commonly used to hold keys, behind the washing machine. Officer Esperanza could not see inside the magnetic box.* He could see some plastic protruding out of the side of the box.

10. *The back of the washing machine was situated approximately six to eight inches from the wall. The magnetic box was located approximately twelve inches below the top of the washing machine.*

11. Upon seeing the magnetic box behind the washing machine, Officer Esperanza was no longer concerned that it might be a weapon or that it presented any risk of danger to the officers. He also did not believe it was evidence of any gambling activity. *But for the protruding plastic, Officer Esperanza could not see the contents of the magnetic box nor determine if the box contained any contraband.*

12. *Officer Esperanza then moved the washing machine another eight to twelve inches away from the wall in order to get a clear view of the magnetic box.* At this point, he could see that the magnetic box was opened slightly, about one-quarter of an inch. *He conducted a closer inspection of the plastic bag protruding from the magnetic box and could see a rock-like substance in the protruding plastic bag.* Based on his training and experience, Officer Esperanza believed that the rock-like substance was methamphetamine.

13. *Officer Esperanza then seized the magnetic box from behind the washing machine,* but decided not to open it until later.

14. Officer Esperanza then left the washroom, informed Defendant of his findings, placed him under arrest and handcuffed him. For officer safety, he removed Defendant's fanny pack from his waist. After doing so, he felt the fanny pack for weapons and determined that it contained an object that felt like a smoking pipe with a bulbous end. Officer Esperanza did not open the fanny pack.

(Emphases added.) The police later obtained a statement from Petitioner and recovered the drug paraphernalia from Petitioner's fanny pack. Petitioner testified at the suppression hearing that he had been to the residence before. He said that he went there once or twice a week to play cards and darts and to smoke "batu." [5]

---

5. "Batu" is the street term for crystal methamphetamine. *Crystal Methamphetamine Fast*

In relevant part the court in its conclusions ruled that the search of the area behind the washing machine and the subsequent inspection of the key box constituted an unreasonable search and the evidence recovered thereafter were the fruits of the illegal search.

1. *The area behind the washing machine where the magnetic box was found and seized by the police was a place where Defendant had a legitimate expectation of privacy* protected under the fourth amendment's proscription against unreasonable searches and seizures. . . .

2. . . . *[T]he subsequent movement of the washing machine away from a wall in order to closely inspect the contents of a magnetic box attached to the back of the washing machine for evidence that otherwise would not have been visible to the police constituted a warrantless search.*

. . . .

*Facts*, National Drug Intelligence Center, Dept. of Justice, available at: *http://www.usdoj.gov./ndic/pubs5/5049/5049p.pdf* (last viewed 3/5/04).

**6.** Conclusion 3 provides as follows:

3. The government failed to establish that the police had probable cause to conduct a search of the back area of the washing machine. The government also failed to meet its burden of overcoming the initial presumption of unreasonableness by proving that the actions of the police fell within a specifically defined and well-delineated exception to the search warrant requirement. *State v. Wallace*, 80 [Hawai'i 382,] 393, 910 P.2d [592,][695] 706 (1996).

**7.** Conclusion 6 provides as follows:

6. The police may, in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest. *State v. Trainor*, 83 [Hawai'i] 250, 258, 925 P.2d 818, 826 (1996). The ultimate test in these situations is whether a man of reasonable caution would be warranted in believing that criminal activity was afoot and that the action taken was appropriate. *State v. Barnes*, 58 Haw. 333, 338, 568 P.2d 1207, 1211 (1977). The police may initially have believed that their safety was endangered or that criminal activity might be afoot and thus, wanted to determine whether the black object in Defendant's right hand was a weapon or evidence of criminal activity. However, the record does not support a finding that the actions of the police

7. *The search of the area behind the washing machine after it was moved away from the wall and the subsequent inspection of a portion of the plastic bag protruding from a one-quarter inch opening of the magnetic box constituted a warrantless search requiring suppression* of the evidence seized from the magnetic box.

8. The arrest of Defendant was based on evidence obtained by means of an impermissible warrantless search. While an issue may exist with respect to the arresting officer feeling the contents of Defendant's fanny pack, *there is no dispute that the evidence recovered from the fanny pack and the statements made by Defendant were fruits of the warrantless search* and must therefore, also be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

(Emphases added.) The prosecution claimed as error conclusions 1, 2, 7 and 8 reproduced above, and conclusions 3 [6] and 6 [7].

were appropriate under the circumstances once it had been determined that the magnetic box was not a weapon and no evidence of criminal activity was visible to the police without moving the washing machine.

We note with respect to conclusion 6 that neither *Trainor*, *Barnes*, nor the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), suggest that a police officer may search one's *home or garage* without a warrant, even if a reasonable suspicion of criminal activity exists. Instead, these cases all stand for the proposition that a limited investigation of a person in a *public place* or during an *automobile stop* may be permissible, if the officer may reasonably infer that the person is armed and dangerous and has a reasonable suspicion that criminal activity was afoot. *Trainor*, 83 Hawai'i at 258–60, 925 P.2d at 826–28. (involving a search in an investigative stop in an airport baggage claim area); *Barnes*, 58 Haw. at 337–39, 568 P.2d at 1211–12 (involving a search and seizure during investigative stop of an automobile); *Terry*, 392 U.S. at 6, 17–30, 88 S.Ct. 1868 (involving a stop and frisk of two men standing on a street corner). If "the officer cannot point to specific and articulable facts which reasonably support his belief that the accused was then armed and dangerous, a more extensive intrusion is prohibited." *Barnes*, 58 Haw. at 339, 568 P.2d at 1212 (citations omitted). To imply that police entry into one's home or garage could be justified on a mere reasonable suspicion of criminal activity and without a warrant would defeat the purpose of article I, section 7 of the Hawai'i Constitution.

In its opening brief the prosecution summed up its position in a two-fold argument [8]: (1) "[Petitioner's] own fourth amendment rights were not violated by the movement of the washing machine since he had no legitimate expectation of privacy in the washing machine or surrounding area and he lacked standing to object to the search because [Petitioner's] own fourth amendment rights were not violated" and (2) "[Petitioner] effectively abandoned the partially open magnetic key holder with the plastic bag[,] . . . thereby relinquishing any personal interest in the key holder and losing any expectation of privacy in the key holder." [9] In its reply brief, the prosecution cited *State v. Tau'a* to support its contention that Petitioner had no standing to claim an expectation of privacy in the washroom. 98 Hawai'i 426, 428, 49 P.3d 1227, 1229 (2002) (holding that because Tau'a, as a passenger, did not have a reasonable expectation of privacy in the truck, his personal constitutional rights were not violated by a warrantless search, and Tau'a could not invoke either article I, section 7 of the Hawai'i Constitution or the fourth amendment to the United states Constitution as a basis for suppressing the evidence recovered from the vehicle).

## II.

■ "[W]e review the circuit court's ruling on a motion to suppress *de novo* " and must look to the entire record on appeal "to determine whether the ruling was 'right' or 'wrong.'" *State v. Hauge*, 103 Hawai'i 38, 47, 79 P.3d 131, 140 (2003). "We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case. . . . Thus, we review questions of constitutional law under the 'right/wrong' standard." *Id.* (quoting *State v. Jenkins*, 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000)).

## III.

In its SDO, a majority of the ICA stated that "[a] defendant must demonstrate that he or she personally has an expectation of privacy in the place searched, and that his or her expectation is reasonable[.]" SDO majority at 4, 102 Hawai'i 382, 76 P.3d 625 (brackets and citations omitted). In that regard, the ICA explained that "[t]he proponent of a motion to suppress has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also, that his or her own rights were violated[,]" and that "this burden of proof [must be satisfied] by a preponderance of the evidence[.]" *Id.* (internal quotation marks, brackets, ellipsis points, and citation omitted).

The ICA majority held that "(1) [Petitioner] had standing to attempt to satisfy his burden of proof and (2) [Petitioner] failed his burden to prove, by a preponderance of the evidence, the reasonableness of his alleged personal expectation of privacy in the place searched." *Id.* at 5. In support of its holding, the majority stated without further explication that, "[a]s a guest, [Petitioner] visited that garage 'once a week, sometimes twice' to play cards and darts[,]" *id.* (brackets omitted), and that "the place searched was a 'washroom' 'in the garage area,'" *id.* The majority noted that "[t]he door to [the] washroom was open" and "[w]hen the door to [the] washroom was open, a person ap-

---

8. As set forth in its brief, the prosecution's objections to conclusions 1, 2, 3, 6, 7, and 8 relate to Petitioner's expectation of privacy in the area searched and his standing to raise a privacy interest. The objections to conclusions 2, 3, 6, 7, and 8 relate to the prosecution's contention that Petitioner had abandoned the key holder. The objection to conclusions 6 and 7 relate to the prosecution's contention that the key holder was in "open and/or plain view." However, in its opening brief, the prosecution posed the two-fold argument set forth above.

9. However, the record does not indicate that the prosecution raised the issue of abandonment in the circuit court. It therefore waived this point as a matter for appeal. *See State v. Rodrigues*, 67 Haw. 496, 498, 692 P.2d 1156, 1158 (1985) (holding that claim of exigent circumstances not raised below by the prosecution in a suppression hearing is waived because "[n]othing in the record even hints that the State was also relying on a finding of exigent circumstances to justify the warrantless search and seizure"). Thus, the court made no findings regarding any purported abandonment theory. The ICA did not mention any abandonment argument but, by its decision, apparently did not believe it applicable or controlling.

proaching the garage could see the washing machine inside that washroom."[10] *Id.*

The dissent, however, argued that Petitioner had an expectation of privacy in the garage that would be recognized as reasonable:

> Given our island weather and customs—in which many Hawaiʻi families spend their leisure time at home in the garage as other families in less temperate climes might spend their leisure time at home in the parlor—that expectation is one that our society is prepared to recognize as reasonable. *State v. Vinuya,* 96 Hawaiʻi 472, 482–83, 32 P.3d 116, 126–27 (App.2001). To be sure, no one—not even a police officer—enters a Hawaiʻi garage without consent, and anyone who enters unbidden is informed of the transgression in no uncertain terms. [Petitioner] could partake of that societal expectation because he was a social guest in the garage at least once or twice a week, a status far exceeding one merely legitimately on the premises[,]" *Minnesota v. Carter,* 525 U.S. 83, 91, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (internal quotation marks omitted) (defendants were in an apartment they had never before visited, bagging cocaine for two-and-a-half hours, and had "paid" the lessee for the privilege), and approaching, if not surpassing, a one-time, "overnight guest[,]" *Minnesota v. Olson,* 495 U.S. 91, 98, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

SDO dissent at 1.

In his petition for certiorari, Petitioner urges, *inter alia,* that (1) "[t]he ICA gravely erred in its virtually exclusive reliance on [*Carter* ], and furthermore [in] erroneously concluding that Petitioner was closer to 'merely legitimately on the premises' when Petitioner's contact with the garage/laundry room exceeded that of a one-time overnight guest[,]" (2) "[t]he ICA gravely erred in its failure to consider Hawaiʻi case law and custom in determining whether Petitioner's expectation of privacy in the garage/laundry room was reasonable under [a]rticle I, section 7 of the Hawaiʻi Constitution[,]" and (3) "[t]he ICA gravely erred in failing to determine that the observations made by the police, even if admissible, did not rise to the level of probable cause or justify a search of the washing machine or seizure of the key holder."

## IV.

As to the first ground raised in the petition, several observations may be made about the Supreme Court decisions referred to by the ICA. In *Olson,* the police made a warrantless, nonconsensual entry into a duplex where Olson was an overnight guest and arrested him. 495 U.S. at 93, 110 S.Ct. 1684. Olson was believed to be the driver of a getaway car in a robbery, and a resident of the duplex's lower unit had informed the police that Olson was inside the upper unit. The Supreme Court concluded that the arrest violated Olson's Fourth Amendment rights, and held that "Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is expected to recognize as reasonable." *Id.* at 96–97, 110 S.Ct. 1684.

The Court further explained that one does not need to be in their own home "in order for him to enjoy a reasonable expectation of privacy there." *Id.* at 97, 110 S.Ct. 1684. It reiterated that "[t]he *Fourth Amendment protects people, not places,*" . . . and provides sanctuary for citizens wherever they have a legitimate expectation of privacy." *Id.* (quoting *Katz v. United States,* 389 U.S. 347, 351, 359, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)) (internal quotation marks omitted) (emphasis added). Thus, "Mr. Katz could complain because he had such an expectation in a tele-

---

**10.** It is unclear where the ICA's majority finds support for its statement that "when the door to the washroom was open, a person approaching the garage could see the washing machine inside that washroom." SDO majority at 5. This assertion is not supported by the court's findings, conclusions, nor in the transcripts of testimony. On the contrary, the officer testified that "there was one car parked in the garage" that "was blocking my view as far as what they were doing specifically on the table." Moreover, the officer had already "proceeded *into the garage* " before viewing inside of the washroom. The officer testified that "[i]t wasn't until I reached . . . towards the front of the vehicle that [Petitioner] . . . walked into the washroom." The officer was only "between five and not more than ten feet" away, "standing in front of [the] table" located inside the garage when he viewed Petitioner inside the washroom.

phone booth, not because it was his 'home' for Fourth Amendment purposes." *Id.* Applying the expectation of privacy formulation, the Court pointed out that "[s]imilarly, *if Olson had a reasonable expectation of privacy as a one-night guest, his warrantless seizure was unreasonable whether or not the upper unit . . . was his home.*" *Id.* (emphasis added).

In *Carter,* the respondents were not overnight guests. They "had come to the apartment for the sole purpose of packaging . . . cocaine. The respondents had never been to the apartment before and were only in the apartment for approximately 2½ hours." 525 U.S. at 86, 119 S.Ct. 469. Chief Justice Rehnquist, announcing the decision, acknowledged that the Court had held that "in some circumstances a person may have a legitimate expectation of privacy in the house of someone else." *Id.* at 89, 119 S.Ct. 469. In comparing the case of "the overnight guest . . . who may claim the protection of the Fourth Amendment in the home of another, and one merely 'legitimately on the premises' as typifying those who may not do so," the Chief Justice indicated that "the present case is obviously somewhere in between." *Id.* at 91, 119 S.Ct. 469. But based on "the purely *commercial nature* of the transaction engaged in here, the relatively *short period of time* on the premises, and the *lack of any previous connection* between respondents and the householder," Rehnquist concluded that "respondents' situation is closer to that of one simply permitted on the premises." *Id.* (emphases added).

In dissent, Justice Ginsburg, joined by Justices Stevens and Souter, stated that she would have held that "when a homeowner or lessor personally invites a guest into her home to share in a common endeavor, whether it be for conversation, to engage in leisure activities, or for business purposes licit or illicit, that guest should share his host's shelter against unreasonable searches and seizures." *Id.* at 106, 119 S.Ct. 469. She reasoned that "[a] homedweller places her own privacy at risk, the Court's approach indicates, when she opens her home to others, uncertain whether the duration of their stay, their purpose, and their 'acceptance into the

household' will earn protection." *Id.* at 107, 119 S.Ct. 469. She warned "that today's decision will tempt police to pry into private dwellings without warrant, to find evidence incriminating guests who do not rest there through the night." *Id.* at 108, 119 S.Ct. 469 (citation omitted). Justice Ginsburg contended that

> [t]hrough the hosts' invitation, the guest gains a reasonable expectation of privacy in the home. [*Olson*] so held with respect to an overnight guest. The logic of that decision extends to shorter term guests as well. Visiting the home of a friend, relative, or business associate, whatever the time of day, serves functions recognized as valuable by society.

*Id.* at 108–09, 119 S.Ct. 469 (citations omitted).

Accordingly, Justice Ginsburg argued that short term guests have a protected right of privacy.

> In sum, when a homeowner chooses to share the privacy of her home and her company with a short-term guest, the twofold requirement "emerging from prior decisions" has been satisfied: Both host and guest "have exhibited an actual (subjective) expectation of privacy"; that "expectation is one our society is prepared to recognize as 'reasonable.' "

*Id.* at 109, 119 S.Ct. 469 (brackets omitted) (quoting *Katz,* 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring)). In his concurring opinion, Justice Kennedy agreed that, "as a general rule, social guests will have an expectation of privacy in their host's home[,]" but in *Carter* the respondents "have established nothing more than a fleeting and insubstantial connection with [the occupant's] home." *Id.* at 102, 119 S.Ct. 469.

Justice Breyer stated that he "agree[d] with Justice Ginsburg that respondents can claim the Fourth Amendment's protection[ ]" but believed the police officers' "observation . . . from a public area outside the curtilage of the residence" did not violate the Fourth Amendment. *Id.* at 103, 119 S.Ct. 469 (concurring separately) (internal quotation marks omitted). Hence, five members of the court would agree with the proposition that, at the least, a "social guest" has a protected privacy

right while in the host's home unless the guest had "nothing more than a fleeting and insubstantial connection" with the home. *Id.* at 102, 119 S.Ct. 469. Thus, under the Fourth Amendment, such social guests would have standing to raise privacy interests.

V.

In a vein similar to *Olson* and *Carter* and as to the second ground raised in the petition, this court has recognized, under the Hawai'i Constitution, that an overnight guest was guaranteed the right to privacy in his host's apartment, even though his host consented to a search. *State v. Matias,* 51 Haw. 62, 68, 451 P.2d 257, 261 (1969). In *Matias,* the police observed the defendant on a balcony of an apartment building after he had been described by victims of a robbery. *Id.* at 64, 451 P.2d at 259. The police converged upon the fourth floor of the building. *Id.* With "neither arrest nor search warrants, four police officers ... obtained permission to enter the apartment from" the other tenant and recovered evidence introduced at trial against the defendant. *Id.* at 63, 451 P.2d at 258.

A majority of this court held that the defendant, "even though an overnight guest of the tenant had a right of privacy in the premises of that apartment." *Id.* at 55, 451 P.2d at 260. It was said "that a person has a 'halo' of privacy wherever he goes and can invoke a protectable right to privacy wherever he may legitimately be and reasonably expect freedom from governmental intrusion." *Id.* at 65–66, 451 P.2d at 259–60; *see also State v. Nabarro,* 55 Haw. 583, 588–89, 525 P.2d 573, 577 (1974) (holding that defendant who was a visitor in a hotel room, which was the subject of a search warrant, had a substantial privacy interest in her purse); *State v. Przeradski,* 5 Haw.App. 29, 34, 677 P.2d 471, 476 (1984) (holding that a lawful warrant to search premises only does not by its own force permit a search of the persons, residents, or visitors, or their belongings, who happen to be present at the time the warrant is executed).

The rationale expressed by Justice Ginsburg in *Carter* is consistent with the majority view in *Matias.* While we ground our decision in article I, section 7 of the Hawai'i Constitution and not the Fourth Amendment, we believe Justice Ginsburg's reasoning to be persuasive. Hence, we agree that "a guest should share his [or her] host's shelter against unreasonable searches and seizures." *Carter,* 525 U.S. at 106, 119 S.Ct. 469. Otherwise, "a homedweller's ... own privacy [is placed] at risk when a homedweller 'opens her home to others.'" *Id.* at 107, 119 S.Ct. 469. We subscribe to the view that "visiting the home of a friend, relative, or business associate whatever the time of day, serves functions recognized as valuable by society," *id.* at 89, 119 S.Ct. 469, and, hence, the expectation of privacy to be afforded such activity is one our society would recognize as reasonable.

■ In this case, Petitioner's guest status stemmed from prior visits to the home and at the time of his arrest. As the ICA indicated, Petitioner's connection with the home was more than fleeting, for he visited the garage once or twice a week to play cards and darts. SDO majority at 5. The fact that Petitioner was not an overnight guest did not detract from the "halo" of privacy that protected him wherever he might "legitimately be and reasonably expect freedom from government intrusion." *Matias,* 51 Haw. at 65–66, 451 P.2d at 259. In visiting the home of a friend, "whatever the time of day," Petitioner was entitled to share in his host's security against unreasonable searches and seizures of the dwelling he was visiting. *Carter,* 525 U.S. at 109, 119 S.Ct. 469. Hence, "in sum, when a homeowner chooses to share the privacy of her home" "with a short term guest" such as Petitioner, "the two fold requirement" of a subjective expectation of privacy and a reasonable expectation of privacy "have been satisfied." *Id.*

In sharing in his host's shelter from unreasonable searches and seizures under article I, section 7 of the Hawai'i Constitution, Petitioner partook of the expectation of privacy his host had in the washroom. This court has held that there is a reasonable expectation of privacy in a separately enclosed laundry room. *State v. Paahana,* 66 Haw. 499, 506, 666 P.2d 592, 597–98 (1983) (holding that suspicion that a gun had been used in terror-

istic threatening incident did not create exi-
gent circumstances to justify search of laun-
dry room from which defendant had been
removed). A reasonable expectation of pri-
vacy has been accorded persons who might
be characterized as trespassers. *State v.
Dias,* 52 Haw. 100, 106–07, 470 P.2d 510, 514
(1970) (holding that defendant had "every
expectation of freedom from government in-
trusion" in passageway located on private
property although not the property of the
defendant). As the ICA dissent noted, in
light of our temperate climate, garages play
a social function in our island life and often
are gathering places for social activities host-
ed by the homedweller. SDO dissent at 1.
Thus, it would follow that our society would
view Petitioner's expectation of privacy in the
washroom within a garage as reasonable.

Here, Petitioner satisfies both prongs of
the privacy test. First, Petitioner demon-
strated a subjective right to privacy when he
walked out of the open garage, into the sepa-
rate washroom and placed the key holder
behind the washing machine, in a secluded
location. Petitioner deliberately secreted the
key box behind the washing machine and in a
private, hidden spot. Second, as stated
above, society would recognize a guest's right
to privacy in his host's washroom as reason-
able.

■ Therefore, we affirm the court's con-
clusion that Petitioner had a reasonable ex-
pectation of privacy in the washroom, but on
independent state constitutional grounds.
"As the ultimate judicial tribunal with final,
unreviewable authority to interpret and en-
force the Hawai'i Constitution, we are free to
give broader protection than that given by
the federal constitution." *State v. Detroy,*
102 Hawai'i 13, 22, 72 P.3d 485, 494 (2003).
Although the court's order did not rest on
such grounds, its decision with respect to a
right of privacy was ultimately correct.
*State v. Taniguchi,* 72 Haw. 235, 240, 815
P.2d 24, 26 (1991) (stating that where deci-
sion below was correct it may be affirmed by
the appellate court even though the trial
court gave the wrong reasons for its actions).

## VI.

■ In the absence of a warrant or exi-
gent circumstances, it is unreasonable for the
government to search an area where a per-
son has an expectation of privacy. *See State
v. Hook,* 60 Haw. 197, 203, 587 P.2d 1224,
1228 (1978) (holding that search of defen-
dant's shed was unlawful because there was
no showing of exigency which was required
in a warrantless seizure of marijuana plants).
As to the third ground stated in the petition,
the search of the washroom area behind the
washing machine was clearly an illegal one.
As the court found, (1) "Officer Esperanza
was no longer concerned that it might be a
weapon or that it presented any risk of dan-
ger to the officers[,]" (2) "[h]e also did not
believe it was evidence of any gambling activ-
ity[,]" (3) "[b]ut for the protruding plastic,
Officer Esperanza could not see the contents
of the magnetic box nor determine if the box
contained any contraband[,]" and (4) "Officer
Esperanza then moved the washing machine
another eight to twelve inches away from the
wall in order to get a clear view of the
magnetic box." At this point, "[h]e conduct-
ed a closer inspection of the plastic bag
protruding from the magnetic box and could
see a rock-like substance in the protruding
plastic bag."

■ Contrary to the prosecution's argu-
ment on appeal, the police were not justified,
under either an "open view" or a "plain view"
exception to the warrant requirement, in
searching the area behind the washing ma-
chine.[11]

The "open view" exception to a warrantless
search does not apply to the present case.
This court has said that "[i]n the *open view*
situation ... the observation takes place
from a *non-intrusive vantage* point. The
governmental agent is either on the *outside*
[,]" of a constitutionally protected area,
"*looking outside[,] or on the outside,*" of a
constitutionally protected area "*looking in-
side at that which is knowingly exposed to
the public.*" *State v. Meyer,* 78 Hawai'i 308,

---

**11.** It is unclear whether the ICA considered a
"plain view" or "open view" analysis, as it did
not specifically refer to plain view or open view

in its holding, but referred to the "reasonable-
ness" of Petitioner's "expectation of privacy."
*See* SDO majority at 5–6.

313, 893 P.2d 159, 164 (1995); *State v. Kaaheena*, 59 Haw. 23, 28, 575 P.2d 462, 466 (1978) (holding that defendants had a reasonable expectation of privacy even though there was a one-inch hole in drapes); *see State v. Stachler*, 58 Haw. 412, 421, 570 P.2d 1323, 1330 (1977) (holding that the defendant had "no reasonable expectation of privacy as to his open marijuana patch viewed from a helicopter" for the patch "was open to the view of any member of the public").

Here, the officer was on the inside of an area protected by the constitution, namely the washroom. The officer "walked into [the] washroom located in the garage area" and, thus, did *not* view the seized items " 'from a non-intrusive vantage point.' " *Meyer*, 78 Hawai'i at 313, 893 P.2d at 164 (quoting *Kaaheena*, 59 Haw. at 28, 575 P.2d at 466). He was not situated on the "outside" looking into an area imbued with privacy protection, but on premises which was subject to privacy. In addition, the items seized in the washroom were located "behind the washing machine." As such, the area searched and the evidence removed were not "exposed to the public." [12] *Id.* Thus, the "open view" exception to a warrantless search did not apply.

 Similarly, the plain view exception does not apply in this case. This court has adopted the following three factors, required by the Supreme Court, to merit a plain view seizure of contraband: "(1) prior justification for the intrusion; (2) inadvertent discovery; and (3) probable cause to believe the item is evidence of a crime or contraband." *Id.* at 315, 893 P.2d at 165. Although the United States Supreme Court has eliminated inadvertent discovery as a requirement of the plain view exception, this court has declined to follow the Supreme Court, explaining that because "we continue to believe that the factor of *inadvertence is necessary for the protection of our citizens* in order to foster the objective of preventing pretextual article I, section 7 activity, we decline to follow *Horton [v. California*, 496 U.S. 126 [128], 144–45, [110 S.Ct. 2301, 110 L.Ed.2d 112] (1990),] to the extent it eliminated inadvertence as a requirement of a plain view sighting." *Mey-*

er, 78 Hawai'i at 314, 893 P.2d at 164 (emphasis added). This court further explained that

> "the rationale behind the inadvertent discovery requirement is simply that we will *not excuse officers from the general requirement of a warrant* to seize if the officers know the location of evidence, have probable cause to seize it, intend to seize it, and yet *do not bother to obtain a warrant* particularly describing that evidence."

*Id.* at 314 n. 6, 893 P.2d at 165 n. 6 (brackets omitted) (emphases added) (quoting *Horton*, 496 U.S. at 144–45, 110 S.Ct. 2301) (Brennan, J., joined by Marshall J., dissenting).

Here, the police did not have "prior justification for the intrusion" into the garage or the washroom. *Id.* at 314, 893 P.2d at 165. As the court found, the "address on the bench warrant was different" from the premises searched at 835 Kuialua Street, thus the police had no legitimate basis for being on the premises. Second, the evidence recovered did not result from "inadvertent discovery[,]" as required by this court in *Meyer*. *Id.* As found by the court, the police officer moved "the washing machine away from the wall in order to closely inspect" the "evidence that otherwise would not have been visible to the police."

### VII.

For the foregoing reasons, the December 19, 2001 order of the court granting Petitioner's motion to suppress evidence is affirmed, but on independent state constitutional grounds discussed herein. The ICA's SDO filed on September 15, 2003, which vacated the court's order, is reversed.

Dissenting Opinion by NAKAYAMA, J., with whom MOON, C.J., joins.

I respectfully dissent from the majority's holding that Cuntapay had a reasonable expectation of privacy in the homedweller's washroom.

Article I, section 7 of the Hawai'i Constitution protects persons against unreasonable searches and seizures. To determine if a person's expectation of privacy is reasonable,

12. *See supra* note 11.

this court adopted the two-part test of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). *State v. Bonnell*, 75 Haw. 124, 139, 856 P.2d 1265, 1274 (1993). "First, one must exhibit an actual, subjective expectation of privacy. Second, that expectation must be one that society would recognize as objectively reasonable." *Id.* (citations and internal quotations omitted). In a motion to suppress, the proponent of the motion bears this burden by a preponderance of the evidence. *State v. Taua*, 98 Hawai'i 426, 434, 49 P.3d 1227, 1235 (2002); *State v. Edwards*, 96 Hawai'i 224, 232, 30 P.3d 238, 246 (2001).

Even if Cuntapay exhibited an actual, subjective expectation of privacy by hiding the key holder behind the washing machine, he failed to establish that his subjective expectation was one that society would recognize as objectively reasonable. During the hearing on his motion to suppress, Cuntapay testified as follows:

> [Prosecution:] Had you been to that residence before?
>
> [Cuntapay:] Yes, but not many times.
>
> [Prosecution:] How many times.
>
> [Cuntapay:] Once a week, sometimes twice.
>
> [Prosecution:] Always for the same thing, to play cards?
>
> [Cuntapay:] Yes, and play dart.
>
> [Prosecution:] Cards and darts. How about to smoke batu?
>
> [Cuntapay:] I admit sometimes.

Relying on this testimony, the majority concludes that Cuntapay held the status of a guest and, thus, was "entitled to share in his host's security against unreasonable searches and seizures of the dwelling he was visiting." I must disagree.

Cuntapay's testimony was, at best, ambiguous, and does not establish an objective, reasonable expectation of privacy beyond the homedweller's garage. The record is devoid of any evidence that Cuntapay was a friend, relative or business associate of the homedweller, or that he was invited by the homedweller and, thus, we are left to guess as to Cuntapay's relationship with the homedweller. Moreover, the record lacks any evidence that Cuntapay was allowed to move beyond the garage into other areas of the homedweller's house, that he frequented the washroom, or that he previously stored his personal belongings in the washroom. Society would not accept as reasonable, that a person physically limited to a homedweller's garage, without more, should expect privacy in all parts of the homedweller's house. Based on the record, Cuntapay failed to meet the second prong of the *Katz* test and, thus, failed to establish that he had a reasonable expectation of privacy in the homedweller's washroom. As such, I would dismiss the application for writ of certiorari as improvidently granted.